UNITED STATES of America,
Plaintiff,

v.

Michael R. MARTIN, William D. Ladd, Management Services of Illinois, Inc., Ronald D. Lowder and James R. Berger, Defendants.

No. 96–30036.

United States District Court, C.D. Illinois, Springfield Division.

March 26, 1999.

J. Steven Beckett, Carol A. Dison, Brett N. Olmstead, Beckett & Associates, Urbania, IL.

Patrick J. Chesley, Patrick D. Hansen, Roger A. Heaton, U.S. Attys., Springfield, IL.

Daniel C. Lanterman, Gramlich Law Offices, Springfield, IL.

Ronald Menaker, Patrick A. Tuite, Arnstein & Lehr, Chicago, IL.

Ronald J. Stone, Stratton, Stone Kopec & Sturm, Springfield, IL.

D. Peter Wise, Gates Wise & Schlosaser PC, Springfield, IL.

## OPINION

RICHARD MILLS, District Judge.

First, Fourth, and Sixth Amendments.

Free press—Rights of privacy—Fair trial.

Competing interests, all to be resolved.

But first, let us put them in context.

On October 24, 1996, a federal grand jury issued a superseding indictment against Michael R. Martin, William D. Ladd, Management Services of Illinois, Inc., Ronald D. Lowder, and James R. Berger charging them with various crimes which centered around their scheme to defraud the Illinois Department of Public Aid of millions of dollars. The Court conducted three separate trials in this matter which began in June 1997 and concluded in January 1998. Along the way, the Court sealed various documents and proceedings pursuant to the requests made by one or more of the parties. The press objected to the sealing of these documents and proceedings, but the Court overruled the press' objections.

The press appealed the Court's denial of its objections. Specifically, the press appealed three rulings of this Court: (1) the Court's denial of its petition to intervene, (2) the Court's denial of its petition for the release of the sealed documents, and (3) the Court's overruling of its objection concerning Governor Jim Edgar's testimony. The United States Court of Appeals for the Seventh Circuit reversed and remanded for further proceedings consistent with its opinion in *In re: Associated Press,* 162 F.3d 503 (7th Cir.1998). Complying with the Seventh Circuit's remand is the task before this Court today.

## I. PRESS AS INTERVENORS

Upon receiving the Seventh Circuit's mandate and pursuant to a motion by the press, the Court scheduled a hearing to resolve the issues on remand. At that hearing, the Court vacated its previous Order denying the press' petition to intervene and allowed the press to intervene for the limited purpose of raising constitutional and common law claims regarding access to Court documents and proceedings. *Id.* at 508.

Although the Court originally denied the press' petition to intervene, it considered and addressed all of the press' arguments regarding the unsealing of the documents and proceedings before doing so. Because it had considered and rejected the press' arguments, the Court believed that it was no longer necessary to allow the press to act as intervenors.

Nevertheless, this practice is not the preferred method in this circuit. *In re Associated Press,* 162 F.3d at 508–09. The Seventh Circuit has held "that the most appropriate procedural mechanism by which to accomplish this task is by permitting those who oppose the suppression of the material to intervene for that limited purpose." *Id.* at 507. Therefore, at the hearing, this Court vacated its prior Order denying the press' petition to intervene and allowed the press to intervene for the limited purpose of raising constitutional

and common law claims regarding access to Court proceedings and documents, thereby accomplishing the Court's first task on remand.

## II. GOVERNOR EDGAR'S TESTIMONY

The second issue which the Court was instructed by the Seventh Circuit to address on remand was the unsealing of the transcript of the agreement made in chambers by the Government and James R. Berger to take the Governor's video deposition. *Id.* at 513. In all other aspects, the Seventh Circuit affirmed this Court's handling of the Governor's testimony. *Id.* at 512–13.

The day prior to the hearing, the Court unsealed the transcript of the agreement made in chambers between the Government and James R. Berger to take the Governor's video deposition. Thus, the Court has accomplished its second task on remand.

## III. ACCESS TO SEALED DOCUMENTS

The Court's final task on remand is to "articulate its reasons for denying access to the documents that are under seal." *Id.* at 510. Although the Court believed that it was clear from the tenor of the three trials and from the comments made throughout why it had sealed various documents and proceedings, it is also cognizant that no single document explained its reasons for sealing certain documents and proceedings. Therefore, the Court will do so here.

As both the United States Supreme Court and the Seventh Circuit have opined, "[t]he public's right of access to court proceedings and documents is well-established." *Grove Fresh Distribs., Inc. v.. Everfresh Juice Co.,* 24 F.3d 893, 897 (7th Cir.1994), citing *Press–Enter. Co. v. Superior Court of California, Riverside County,* 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984). Moreover,

[p]ublic scrutiny over the court system serves to (1) promote community respect for the rule of law, (2) provide a check on the activities of judges and litigants, and (3) foster more accurate fact finding. *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980).... Justified originally by common-law traditions predating the enactment of our Constitution, the right of access belonging to the press and the general public also has a First Amendment basis. *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 603, 102 S.Ct. 2613, 2618, 73 L.Ed.2d 248 (1982). Neither the common-law nor the constitutional right is absolute. More general in its contours, the common-law right of access establishes that court files and documents should be open to the public unless the court finds that its records are being used for improper purposes. *United States v. Corbitt,* 879 F.2d 224, 228 (7th Cir.1989). The First Amendment presumes that there is a right of access to proceedings and documents which have "historically been open to the public" and where the disclosure of which would serve a significant role in the functioning of the process in question. *Id.* This presumption is rebuttable upon demonstration that suppression "is essential to preserve higher values and is narrowly tailored to serve that interest." *Press–Enterprise,* 464 U.S. at 510, 104 S.Ct. at 824.

*Id.*

In the instant case, the Court sealed various documents and proceedings for two reasons. First, the Court believed that sealing the various documents and proceedings which it did was the best way to ensure that Defendants received their Sixth Amendment right to a fair trial. As the Court explained in a previous Opinion, the juries in these trials were not sequestered. *United States v. Berger,* 990 F.Supp. 1051, 1053 (C.D.Ill.1997). The Court was of the opinion that if it did not seal certain information, the press would

report that information, and the jurors may—albeit inadvertently—read, hear, or view those press reports. *Id.* The Court believed that if a juror had read, heard, or viewed the sealed information, that juror may have drawn unwarranted conclusions adverse either for or against one or more Defendants or the Government and would not have based his or her verdict solely upon the evidence presented in Court, thereby depriving the parties of their Sixth Amendment right to a fair trial. *Id.; see United States v. Cojab,* 996 F.2d 1404, 1405 (2d Cir.1993) (noting that "[t]o protect a defendant's Sixth Amendment right to a fair trial, a courtroom may be closed and its records sealed."); *see also United States v. Gerena,* 869 F.2d 82, 85 (2nd Cir.1989) (opining that "[t]he district court must balance the public's right of access against the privacy and fair trial interests of defendants, witnesses and third parties."); *see also Seattle Times Co. v. United States Dist. Court for the W. Dist. of Washington,* 845 F.2d 1513, 1516 (9th Cir. 1988) (recognizing that "[t]he right of access is not absolute and must be balanced against the defendant's sixth amendment right to a fair trial.").

Contrary to the press' assertions to the Seventh Circuit, the Court's concern regarding a juror following the medias' coverage of the trial was not mere musings or speculation. *In re Associated Press,* 162 F.3d at 512. During the first trial, the Court was forced to excuse a juror because she had disregarded the Court's daily admonishment to avoid the media's coverage of the trial in that she daily cut out of the newspaper(s) the stories and articles dealing with the trial. Obviously, in order to know which portion of the newspaper(s) to extract, the juror had to read at least some of the press' coverage of the trial. While the Court's decision to seal entire documents may have been overly cautious, at the time, the Court believed it to be the best means possible of ensuring Defendants' Sixth Amendment right to a fair trial.

Second, the Court believed that sealing the various documents and proceedings which it did was the best way to ensure the integrity of the Government's continuing investigation. During the trial and for several months thereafter, the Government repeatedly represented to the Court that its investigation into the scheme to defraud the Illinois Department of Public Aid was on-going. In fact, although the Court had asked the Government to inform it when the investigation had been completed, the Government did not do so until the Court conducted the subject hearing to resolve the remanded issues.[1]

Thus, in an effort to avoid compromising the Government's continuing investigation, the Court sealed certain documents and proceedings. In so doing, the Court was cognizant that while the Seventh Circuit had not stated its position as to whether an on-going criminal investigation constituted a compelling interest requiring closure, other circuits had ruled that sealing certain documents in the interest of maintaining the integrity of a criminal investigation was appropriate. *See United States v. Valenti,* 987 F.2d 708, 714 (11th Cir.1993) (holding that "the district court properly denied the [press'] emergency motion to unseal as a necessary means to achieving the government's compelling interest in the protection of a continuing law enforcement investigation."); *see also In re Search Warrant for Secretarial Area Outside Office of Gunn,* 855 F.2d 569, 574 (8th Cir.1988) (holding that the district court properly sealed affidavits and other materials attached to search warrants because "[t]here [wa]s a substantial probability that the government's on-going investigation would be severely compromised if the sealed documents were released."). Therefore, in perhaps an overabundance of

---

1. Evidently, the Government informed the press sometime earlier that its investigation had been completed.

caution, the Court sealed certain documents and proceedings in order to protect the integrity of the Government's continuing criminal investigation of the events surrounding the scheme to defraud the Illinois Department of Public Aid.

However, now that all Defendants have been tried and the Government has informed the Court that its investigation has been completed, there is no longer a compelling interest to keep the Court's documents and proceedings under seal *in toto*. Accordingly, the day before the hearing, the Court entered an Order unsealing the majority of the documents and proceedings which had heretofore been kept under seal.

At the hearing, counsel for the Government, Defendants Berger and Fleming, and the press presented arguments regarding the remaining sealed documents. The Court did not unseal these remaining documents based upon objections by the Government and/or Defendants. Accordingly, the Court and the parties agreed that counsel for the Government and Defendant Berger would redact certain portions of the remaining sealed documents and, with the Court's permission, would make the redacted documents available to the press and the public. If the press objected to the redacted versions of the documents, the Court granted them leave to file objections to the redacted versions and also granted leave to the Government and Defendants to file a response to the press' objections.

The press has objected to the redacted version of the documents, arguing that it is entitled to view the documents in their entirety. In essence, the press' objections fall into four categories.[2]

## A. UNINDICTED CO-CONSPIRATORS

■ The press objects to the Government's request that the Court keep the names of the five unindicted co-conspirators under seal. The press argues that because the Government has announced that the MSI investigation has been completed, there is no threat that the unindicted co-conspirators will be denied their right to a fair trial if their names are made public. In this regard, the press asserts that the cases cited by the Government are distinguishable because in those cases, the press sought early access to the names of unindicted co-conspirators. Here, both the trial and the investigation are over. Thus, the press claims that there is no threat to the unnamed co-conspirators' right to a fair trial (because there will be no further trials) or to the Government's investigation (because the investigation is over).

Furthermore, the press claims that it should have access to the records upon which the Court relied and that there is no right of privacy when individuals participate in a crime. The press also asserts that it is entitled to access to the names of the unindicted co-conspirators based upon the Illinois Freedom of Information Act. 5 ILCS 140/7(b). Finally, the press argues that disclosing the unindicted co-conspirators' names will serve the fundamental interests of ensuring public confidence in the criminal justice system and promoting an understanding of the judicial system in general and in this case in particular. Accordingly, the press asks the Court to provide it and the public unredacted versions of the documents which contain the names of the five unindicted co-conspirators.

---

**2.** At the hearing, the parties, including the press, agreed that two documents should remain entirely under seal. The first document was a postcard sent directly to the Court from an individual alleging that persons other than those indicted were guilty of wrong doing in the scheme to defraud the Illinois Department of Public Aid. The second document was a memorandum from a member of the Court's staff relating a telephone conversation from a woman alleging that the Illinois State Police and the Federal Bureau of Investigation had been harassing her because she had information relevant to the MSI trial. In fact, this lady wanted the Court to know that she wanted to testify at the trial.

The Government argues that the press has failed to adequately explain how the disclosure of the names will promote either an understanding of or confidence in the criminal justice system. Moreover, the Government claims that the cases cited in its memorandum of law support the continued sealing of the unindicted co-conspirators' names. Finally, the Government asserts that the Illinois Freedom of Information Act is inapposite. Therefore, the Government asks the Court to keep the names of the five unindicted co-conspirators under seal.

The Court is persuaded by the Government's arguments and by the cases cited in support thereof. First, although both the First Amendment and the common law generally require access to "proceedings and documents which have 'historically been open to the public' and where the disclosure of which would serve a significant role in the functioning of the process in question", *Grove Fresh*, 24 F.3d at 897, quoting *Corbitt*, 879 F.2d at 228, it is not at all clear how disclosing the names of the unindicted co-conspirators will promote an understanding of or confidence in the criminal justice system. The reasons why the Government sought to have the unindicted co-conspirators' statements entered as evidence and the reasons why the Court allowed those statements have been made public. Thus, simply disclosing the names of the unindicted co-conspirators will not serve nor further the purposes tendered by the press.

On the contrary, the only possible reason for disclosing the names is to stigmatize these five individuals as "co-conspirators." In fact, the press has acknowledged that the Government's memorandum and the Court's Order on this issue adequately explain to the public the dynamics of the co-conspirators' statement exception to the hearsay rule and how that exception operated in the instant case.[3] The only information which has been withheld is the names of the co-conspirators, and the Court believes that revealing the co-conspirators' identities would add nothing to the public's understanding of or confidence in the criminal justice system.

On the other hand, a compelling interest exists for the continued closure of the identities of the unindicted co-conspirators. The Supreme Court and the Seventh Circuit have recognized that the "presumption of access is rebuttable when it is demonstrated that suppression is necessary to preserve 'higher values' and when the suppression is 'narrowly tailored' to serve those interests." *In re Associated Press*, 162 F.3d at 506, quoting *Grove Fresh*, 24 F.3d at 897 and *Press–Enterprise*, 464 U.S. at 510, 104 S.Ct. 819; *Globe Newspaper*, 457 U.S. at 607–10, 102 S.Ct. 2613.

Here, the Court finds that the presumption of access to the Court's documents and proceedings is outweighed by the unindicted co-conspirators' Fourth Amendment privacy interests, that redaction of their names is narrowly tailored to protect their privacy interests, and that less restrictive alternatives are not available. In reaching this conclusion, the Court is persuaded by the reasoning of the Third Circuit in *United States v. Smith*, 776 F.2d 1104 (3rd Cir.1985).[4]

In *Smith*, the Third Circuit held that the district judge correctly denied the media's request to obtain a list of unindicted co-conspirators contained within a bill of particulars. *Smith*, 776 F.2d at 1114. In so holding, the Third Circuit opined:

> If published, the sealed list will communicate to the general public that the named individuals, in the opinion of the

---

**3.** In its response, the press acknowledged that "[t]he Government has produced, for public consumption, a fifteen page memorandum detailing the factual basis for its argument that these five individuals were part of a conspiracy." The press has also acknowledged that

"[a]ll that is sought at this point are the names of these persons for confirmation purposes; ..."

**4.** The Seventh Circuit has cited *Smith* with approval. *Corbitt*, 879 F.2d at 232 n. 9.

chief federal law enforcement official of the District, are guilty, or may be guilty, of a felony involving breaches of the public trust. This broad brush assertion will be unaccompanied by any facts providing a context for evaluating the basis for the United States Attorney's opinion with respect to any given individual. . . . . Finally, as the trial judge noted, the named individuals have not been indicted and, accordingly, will not have an opportunity to prove their innocence in a trial. This means that the clearly predictable injuries to the reputations of the named individuals is likely to be irreparable.

The individuals on the sealed list are faced with more than mere embarrassment. It is no exaggeration to suggest that publication of the list might be career ending for some. Clearly, it will inflict serious injury on the reputations of all.

*Id.* at 1113–14 (footnote omitted); *see United States v. Anderson,* 799 F.2d 1438, 1441–42 (11th Cir.1986) (affirming the district court's decision to seal a list of persons named in a bill of particulars as unindicted co-conspirators).

As the Government has noted, in the instant case, the chief law enforcement officer of this District concluded that, more likely than not, these five individuals were co-conspirators. In addition, the Court allowed the Government to offer these five individuals' statements because it found, for evidentiary purposes, that the statements did not constitute hearsay because the statements were "offered against a party and [were made] by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed.R.Evid. 801(d)(2)(E). Thus, for the reasons given in *Smith,* the Court finds that the presumption of access to the Court's documents and proceedings is outweighed by the unindicted co-conspirators' Fourth Amendment privacy interests. *Smith,* 776 F.2d at 1113; *see also Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 598,

98 S.Ct. 1306, 55 L.Ed.2d 570 (1978) (noting that the common law and First Amendment right of access may at times give way to privacy rights).

■ Second, the press' argument based upon the Illinois Freedom of Information Act is inapposite. Initially, the Court notes that the Act's purpose was to require the State of Illinois to make information available upon request, not to resolve the type of issues before this Court. *Roehrborn v. Lambert,* 277 Ill.App.3d 181, 186, 660 N.E.2d 180, 183, 213 Ill.Dec. 923, 926 (1995). Therefore, the Court believes that the Act is irrelevant in the instant case.

However, even if the Act had some bearing upon the instant case, as the Court has explained above, the unindicted co-conspirators' privacy interests outweigh the public's right of access to their identities. 5 ILCS 140/7(1)(b); *Lieber v. Bd. of Trustees of S. Illinois Univ.,* 176 Ill.2d 401, 408–09, 680 N.E.2d 374, 377–78, 223 Ill.Dec. 641, 644–45 (1997); *Healey v. Teachers Retirement Sys.,* 200 Ill.App.3d 240, 243, 558 N.E.2d 766, 768–69, 146 Ill.Dec. 803, 805–06 (1990). Accordingly, the press' objection to the redaction of the names of the five unindicted co-conspirators is denied.

### B. *IDENTIFICATION OF THE PUBLIC AID EMPLOYEE, FLEMING'S TAPES AND TRANSCRIPTS, & BERGER'S BACKGROUND CHECK*

The press also objects to: (1) the redaction of the identification of the Public Aid employee who allegedly had an extra-marital affair with another Public Aid employee which in turn caused him to exercise influence in the hiring and/or promotion of that Public Aid employee, (2) the wholesale sealing of the tapes and transcripts of the taped conversations between Curtis G. Fleming and Michael R. Martin and between Fleming and Ronald D. Lowder, and (3) the redaction of the documents surrounding James R. Berger's background check. The press argues that the Court should disclose the Public Aid em-

ployee's name in order to guard against any confusion by the public. The press asserts that disclosure is necessary to serve the fundamental interests of ensuring public confidence in the criminal justice system and promoting an understanding of the judicial system in general and in this case in particular. The press also claims that disclosure is mandatory under the Illinois Freedom of Information Act.

Furthermore, the press argues that the Court should unseal, *in toto*, the Fleming tapes and transcripts and Berger's background check because in order to gather that information, public funds were used. Thus, the press claims that the public has an interest in and a right to know how the Government is using its tax dollars. Moreover, the press asserts that the evidence obtained played a key role in determining trial strategy, the progress of the trials, and in the trials' outcomes. As such, the press argues that the public's confidence in the judicial system demands that citizens know how the Government can affect the conduct of trials and the trial rights of criminal defendants.

The Government argues that although the press alleges that disclosure will foster and promote the public's faith in and understanding of the judicial system, it never explains how that would be so. Moreover, contrary to the press' argument, the Government asserts that the identity of the Public Aid employee, the Fleming tapes and transcripts, and Berger's background check constitute classic discovery materials which are not subject to public disclosure. The Government asks the Court to reject the press' theory that material which played a key role in the progress or outcome of a trial, which was collected by the FBI, and/or which would not interfere with an on-going criminal investigation should be disclosed. The Government claims that such a test would have dramatic effect, including the denial of a defendant's Sixth Amendment right to a fair trial. Accordingly, the Government asks the Court to deny the press' objections.

■ The Court agrees with the Government that the press' "revolutionary theory" regarding the disclosure of evidence which has not been admitted at trial is without merit. Discovery material, historically, has not been available to the public or the press. *See Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 33, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984) (holding that pretrial interrogatories and depositions "were not open to the public at common law"); *Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 389, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979) (Burger, C.J.concurring) (noting that "it has never occurred to anyone, so far as I am aware, that a pretrial deposition or pretrial interrogatories were other than wholly private to the litigants."); *see also In re Associated Press*, 162 F.3d at 512 (opining that "until admitted into the record, potential evidence is not ordinarily within the scope of the press access."); *see also Grove Fresh*, 24 F.3d at 897–98 (same).

The Court believes that the Fleming tapes and transcripts constitute discovery material to which the First Amendment and common law presumption of access does not apply. Neither the tapes nor the transcripts were offered as evidence at any of the three trials. The Government merely presented the items to the Court so that the Court could adequately determine whether the tapes would be admissible as impeachment evidence should either Ronald D. Lowder or Michael R. Martin testify on their own behalf. Although the Court ruled that the tapes would be admissible, the Government never used the tapes or the transcripts as impeachment material.

Likewise, Berger's background information was never entered as evidence at trial. Berger filed a motion *in limine* to prevent the Government from introducing this background information as impeachment material if he decided to offer reputation evidence during his case-in-chief. Berger did not offer any reputation evidence, and therefore, the Government did not offer the evidence which has been redacted as

impeachment material at trial.[5] Thus, the information which the press now seeks is not a part of the record to which the presumption of access applies.

Adopting the press' test regarding access to this information would have dramatic and drastic consequences. First, the press' position swallows the discovery rule. During a federal criminal investigation, most, if not all, of the evidence gathered will have an effect upon the outcome and/or progress of the trial and will have been gathered by the FBI or some other Governmental agency. If the press' argument is correct (i.e., that it and the public are entitled to all of the information in the Government's possession), then the Supreme Court's ruling in *Seattle Times* that the press is not entitled to discovery material was superfluous. *Seattle Times,* 467 U.S. at 33, 104 S.Ct. 2199. Therefore, the Court rejects the press' broad interpretation of the First Amendment and common law right of access to the information within the Government's possession but not offered as evidence at trial.

■ Second, the identity of the Public Aid employee, the Fleming tapes and transcripts, and Berger's background information was presented to the Court *via* motions *in limine.* In *In re Gannett News Serv., Inc.,,* 772 F.2d 113 (5th Cir.1985), the Fifth Circuit, in affirming the district court's decision to seal information contained within and filed in support of motions *in limine,* held:

> We are not dealing with evidence here at all; not even with material which has been offered into evidence. The material in question has been filed with the district court solely in connection with and response to defendants' motions in limine.... Had it not been for the motions there would be no material on file for petitioners to seek access to.... We are reluctant to burden a good faith nonfrivolous motion in limine with the risk that if it is unsuccessful the movant

must suffer adverse pretrial publicity, and consequent potential prejudice to a fair trial, which would not have occurred had the motion not been filed. The use of the motion in limine device itself is often very important in securing a fair trial. The undesirability of putting such a "price" on it is a factor weighing against the position of petitioners.

*Id.* at 116; *see United States v. McVeigh,* 119 F.3d 806, 813 (10th Cir.1997) (holding that "the right of access to suppressed hearings and accompanying motions does not extend to the evidence actually ruled inadmissible in such a hearing.").

Likewise, in the instant case, had it not been for the motions *in limine,* the information which the press now seeks would not have been on file with the Court, and the press would not have been entitled to the information because it constituted discovery material. *In re Gannett,* 772 F.2d at 116; *Seattle Times,* 467 U.S. at 33, 104 S.Ct. 2199. If the Court were to rule that the public and the press should have access to any and all information contained within a motion *in limine,* such a ruling would have a chilling effect upon a litigant's use of motions *in limine.*

In essence, the party would be left with a Hobson's choice. *McVeigh,* 119 F.3d at 814. If a party wanted to obtain a pretrial ruling from a court to exclude certain evidence, he could file a motion *in limine* specifying the evidence which he sought to have excluded, knowing that the press would have access to that information and may report it. This information could then be read by a juror or a potential juror and could affect the outcome of the trial or, at the very least, cause embarrassment to the movant. On the other hand, he could refrain from filing a motion *in limine,* so that the press does not have access to the information, hoping either that his opponent does not offer the evidence at trial or that the court sustains his objection and instructs the jury to disregard the evidence if the opponent attempts

---

**5.** In fact, the Government conceded that they would not attempt to use this information

even if Berger had offered reputation evidence.

to offer it. In either event, the party runs a substantial risk of prejudice.

Motions *in limine* play an important role prior to and during the course of a trial. Granting general access to information contained within motions *in limine* in all situations, as request by the press, could deter a party from utilizing motions *in limine*, thereby disrupting the flow of a trial, interfering with a party's trial strategy, and, possibly, depriving a defendant of his Sixth Amendment right to a fair trial.

As for the press' argument that the disclosure of the Public Aid employee's identity and Berger's background information would foster confidence in and an understanding of the criminal justice system, the Court disagrees. The Court has made available most of the information contained within the Court documents relating to these issues. The slight redactions which the Court has made in order to protect the Fourth Amendment privacy rights of the individuals involved do not hamper either the public's faith in or an understanding of the criminal justice system. In addition, the minor redactions are the least restrictive methods of serving both the First Amendment's right of access and the Fourth Amendment's privacy concerns. Finally, regarding the press' Illinois Freedom of Information Act argument, the Court has adequately considered and rejected that argument herein.

*Ergo,* the press' objections to the disclosure of the redacted versions of the documents and proceedings are DENIED. The Clerk of the Court is DIRECTED to docket the attached redacted versions of docket entries 194, 228, 229, 355, 366, 368, 369, 383, 387, 403, and 537. Docket entries 228, 229, and 538 [6] shall remain under seal *in toto*.

---

6. Docket entry 538 is a transcript of an offer of proof made by the Government relating to the subject matter of docket entry 194. The Court is keeping the transcript under seal *in* *toto* because it agrees with the Government that redaction cannot be meaningfully accomplished without having the transcript rendered meaningless.